IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SKAGIT

| | |
|---|---|
| STIRLING HORT, LLC, a Washington limited liability company,<br><br>                    Plaintiff,<br><br>v.<br><br>INDUSTRIAL VENTILATION, INC., an Idaho corporation,<br><br>                    Defendants. | Case No: 21-2-00587-29<br><br>NOTICE THAT ACTION HAS BEEN REMOVED TO FEDERAL DISTRICT COURT |

**TO:**     Wolf & Lee, LLP, Plaintiff's counsel of record;

**AND TO:**     THE CLERK OF THE ABOVE-ENTITLED COURT

COMES NOW the defendants and provides notice to the Skagit County Superior Court of the removal of this action by way of the attached Notice of Removal dated August 12, 2022, in the above-entitled action. This notice is provided pursuant to 28 U.S.C. § 1446(d) which provides in part that upon receipt the clerk of such State court " . . . shall effect the removal and the State court shall proceed no further unless and until the case is remanded."

DATED this 15th day of August 2022.

FREY BUCK, P.S.

By: _____
Ted Buck, WSBA #22029
Nick Gross, WSBA #48236
Attorneys for Defendant Industrial Ventilation, Inc.

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

## CERTIFICATE OF SERVICE

The undersigned certifies under the penalty of perjury according to the laws of the United States and the State of Washington that on this date I caused to be served in the manner noted below a copy of this document entitled **NOTICE THAT ACTION HAS BEEN REMOVED TO FEDERAL DISTRICT COURT** on the following individuals:

| | |
|---|---|
| **Counsel for Plaintiff**<br>Mark J. Lee, WSBA #19339<br>Haylee J. Hurst, WSBA #51406<br>Elizabeth Slattery, WSBA #56349<br>Wolf & Lee, LLP<br>230 E. Champion Street<br>Bellingham, WA 98225<br>mark@bellinghamlegal.com<br>haylee@bellinghamlegal.com<br>elizabeth@bellinghamlegal.com | [X]    Via E-mail<br>[  ]    Via E-Service |

DATED this 15ᵗʰ day of August 2022 at Seattle, Washington.

*Reychyl Ziemer*
Reychyl Ziemer

NOTICE THAT ACTION HAS BEEN REMOVED TO
FEDERAL DISTRICT COURT – Page 2 of 3

FREY BUCK, P.S.
1200 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101
P: (206) 486-8000 F: (206) 902-9660

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| STIRLING HORT, LLC, a Washington limited liability company,<br><br>            Plaintiff,<br><br>    vs.<br><br>INDUSTRIAL VENTILATION, Inc., an Idaho corporation,<br><br>            Defendant. | Case No.<br><br>Removed from:<br><br>Superior Court of the State of Washington, Skagit County<br><br>State Court Civil No. 21-2-00587-29<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION PURSUANT TO 28 U.S.C. § 1441** |

TO: The Clerk of the Court

AND TO: Plaintiff Stirling Hort, LLC and its attorney Mark Lee of Wolf & Lee, LLP.

    Defendant Industrial Ventilation, Inc. ("IVI"), by and through its attorneys, respectfully state as follows:

1. IVI hereby exercises its rights under 28 U.S.C. § 1441 *et seq.* to remove this action, on the basis of diversity of jurisdiction, from the Superior Court of the State of Washington, Skagit County, in which the case is now pending as *Stirling Hort, LLC v. Industrial Ventilation, Inc.*, Case No. 21-2-00587-29.

2. This is a civil action in which plaintiff Stirling seeks more than $75,000 in damages. Though Stirling did not demand a specific sum in its complaint, it has filed papers in

NOTICE OF REMOVAL - 1

**FREY BUCK, P.S.**
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

state court claiming that its damages "exceed $700,000.00." *See* Exhibit A (Stirling's Memorandum of Law in Support of Motion to Approve Reasonableness of Settlement with Defendant Knutzen Farms, L.P.) at page 5, lines 3-5. By the preponderance of the evidence, the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1446(b)(2)(B).

3. Stirling is a limited liability company with its principal place of business in Washington State.

4. IVI is a corporation with its principal place of business in Idaho.

5. This Notice of Removal is timely under 28 U.S.C. § 1446(b)(3) because it is being filed within thirty days after the August 4, 2022 dismissal from the case of defendant Knutzen Farms, L.P. ("Knutzen"), a limited partnership with its principal place of business in Washington State. *See* Exhibit B (DISMISSAL ORDER). Prior to Knutzen's dismissal, the action was not removable because two parties (Stirling and Knutzen) were domiciled in Washington State and therefore the parties did not have complete diversity of citizenship.

6. Based on the foregoing, removal of all claims and causes of action in this matter is appropriate under 28 U.S.C. §1441 because Stirling and IVI are of diverse citizenship and the amount in controversy exceeds $75,000.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Stirling's claims allegedly arose in Skagit County, Washington. *See* Exhibit C (Complaint) at ¶1.4.

8. IVI removes this action to this Court without waiving any objections or defenses.

9. Pursuant to Local Civil Rule ("LCR") 101(b), attached hereto are true and correct copies of the operative complaint (Exhibit C) and a certificate of service listing all

FREY BUCK, P.S.
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000 FAX 206.902.9660

counsel who have appeared in this action with their contact information, including email address (Exhibit D). No jury demand has been filed in this action. This Notice of Removal is also being filed with a Civil Cover Sheet.

10. Pursuant to 28 U.S.C. § 1446(d), written notice of the filing of this Notice of Removal will be promptly served upon Stirling and filed with the court clerk of the Superior Court of the State of Washington, Skagit County.

11. Pursuant to LCR 101(c), within fourteen days of the filing of this Notice of Removal, IVI will file with the court clerk true and correct copies of all additional records and proceedings in the state court.

WHEREFORE, IVI removes this action in its entirety from the Superior Court of the State of Washington, Skagit County to the United States District Court for the Western District of Washington at Seattle.

DATED this 15th day of August 2022, at Seattle, Washington.

By: _____

Ted Buck, WSBA #22029
Nick Gross, WSBA #48236
Attorneys for Defendant Industrial Ventilation, Inc.

NOTICE OF REMOVAL - 3

FREY BUCK, P.S.
1200 Fifth Ave, Suite 1900
Seattle WA 98101
TEL 206.486.8000  FAX 206.902.9660

<u>Certificate of Service</u>

The undersigned certifies under the penalty of perjury according to the laws of the United States and the State of Washington that on this date I caused to be served in the manner noted below a copy of this document entitled **NOTICE OF REMOVAL OF CIVIL ACTION PURSUANT TO 28 U.S.C. § 1441** on the following individuals:

| | | |
|---|---|---|
| **<u>Counsel for Plaintiff</u>** | [ ] | USPS |
| Mark J. Lee | [X] | E-service via E-mail |
| Haylee J. Hurst | | |
| Elizabeth Slattery | | |
| Wolf & Lee, LLP | | |
| 230 E. Champion Street | | |
| Bellingham, WA 98225 | | |
| E-mail: mark@bellinghamlegal.com | | |
| E-mail: haylee@bellinghamlegal.com | | |
| E-mail: elizabeth@bellinghamlegal.com | | |

DATED this 15th day of August, 2022, at Seattle, Washington.

*Reychyl Ziemer*

Reychyl Ziemer

NOTICE OF REMOVAL - 4

Exhibit A

**IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON**
**IN AND FOR SKAGIT COUNTY**

| | |
|---|---|
| STIRLING HORT, LLC, a Washington limited liability company,<br><br>        Plaintiff,<br><br>    vs.<br><br>KNUTZEN FARMS, L.P., a Washington limited partnership; and INDUSTRIAL VENTILATION, INC., an Idaho corporation,<br><br>        Defendants. | CASE NO. 21-2-00587-29<br><br>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P. |

Plaintiff Stirling Hort, LLC ("Stirling") seeks recovery of damages arising from the release of herbicides and corresponding contamination of its marijuana plants, product, and seeds. Stirling has reached a conditional Settlement Agreement with Defendant Knutzen Farms, L.P. ("Knutzen"), in which Knutzen proposes to pay its insurance policy limits of $100,000.00 to Stirling in exchange for a full release of all claims. This would leave all claims against Defendant Industrial Ventilation, Inc. ("Industrial") left to be litigated. Based upon RCW 4.22.060, Stirling seeks approval of the conditional settlement with Knutzen as

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P**
Page 1 of 10

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

reasonable and further that Knutzen is free of all claims of Industrial for contribution and common law indemnity.

## PERTINENT FACTS

Stirling holds a Marijuana Producer Tier 2 License from the Washington State Liquor and Cannabis Board ("LCB") and was operating from an independent building located at 15612 Best Road, Mount Vernon, Washington. Stirling's loss arose when the LCB randomly tested some of its plants and discovered Chlorpropham in amounts exceeding the state action levels. Given this contamination, the LCB took possession and destroyed all of Stirling's plants, seeds, and product located at its facility.

Stirling maintains that the source of this contamination was fumigation work performed for Knutzen. Knutzen is a potato farm, and in this capacity has for many years used a potato storage room located in a separate building on the property on which Stirling's facility was located. In or around late 2018, Knutzen had potatoes in the storage room and decided that they needed to be treated with herbicides to inhibit sprouting. Declaration of Kraig Knutzen in Support of Plaintiff Stirling Hort, LLC's Motion to Approve Reasonableness of Settlement with Knutzen Farms, L.P. ("Knutzen Declaration"), p. 2, ¶ 5. Knutzen has used Industrial for all herbicide applications for many years, and so would have, under its normal practices, contacted Industrial to perform the work. Id. at ¶ 4. Under normal protocol, Knutzen's initial role would have been limited to advising Industrial of the storage location, the variety of the potatoes, and the tonnage. Id. at ¶ 5.

On the day of the work, Kraig Knutzen, one of the partners of Knutzen, would have met the Industrial personnel on site to open the door to the storage room and advise where the

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P**
**Page 2 of 10**

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

power, air, and venting control systems were located. Once this general information was provided, then Mr. Knutzen would have left, and Industrial would have performed the actual application work. This would include selection of the herbicide to use and the decision to apply it through fumigation and the actual application of the herbicides. Id. at p. 3, ¶¶ 6-7.

Once the work was completed, Mr. Knutzen would have received a notice from Industrial. When Knutzen re-entered the storage space, it would typically find a sticker placed by Industrial on the air and vent controls that instructed it on when and how to restart these systems. Knutzen always followed the instructions provided by Industrial. Id. at ¶ 8.

In this particular case, Mr. Knutzen was advised through a phone call from someone at the Food Hub, an operation adjacent to the storage room, that herbicides had escaped the storage room. Mr. Knutzen agrees that it was not desirable nor expected for herbicides to escape. Knutzen had potatoes fumigated in the at-issue storage room on many prior occasions by Industrial and never had any problems with herbicides escaping. Mr. Knutzen has no knowledge how the herbicides escaped the storage room. Id. at pp. 3-4, ¶ 9.

All work to apply the herbicides to the potatoes was performed by Industrial, and Knutzen understood Industrial to be an independent contractor to Knutzen. Other than general information about the stored potatoes and the location of the facility, Knutzen relied upon Industrial to exercise its independent judgment and expertise to perform the work. Industrial performed all of the herbicide application work with its own equipment. Id. at p. 4, ¶ 10.

Stirling and Knutzen have entered into a conditional Settlement Agreement to resolve this action as between them, which calls for Knutzen to pay Stirling its insurance policy limits of $100,000.00 in exchange for a total release of all claims. Exhibit A to Affidavit of Mark J.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P**
**Page 3 of 10**

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

Lee.  The Settlement Agreement makes clear that it is contingent upon securing confirmation as to its reasonableness under RCW 4.22.060 and confirmation that Knutzen is free of any claims for contribution or indemnity.  It is also clear that the proposed release, which is contingent upon the above, extends only to claims of Stirling against Knutzen alone, and that all claims against Industrial are not released and will continue to be prosecuted in this matter.

## DISCUSSION

A.     The Proposed Settlement With Knutzen Is Reasonable.

RCW 4.22.060 provides as follows:

> A party prior to entering into a release, covenant not to sue, covenant not to enforce judgment, or similar agreement with a claimant shall give five days' written notice of such intent to all other parties and the court....A hearing shall be held on the issue of the reasonableness of the amount to be paid with all parties afforded an opportunity to present evidence.  A determination by the court that the amount to be paid is reasonable must be secured....

> The burden of proof regarding the reasonableness of the settlement offer shall be on the party requesting the settlement.

In general, a reasonableness hearing under this provision is "an equitable proceeding to which no jury trial right is afforded."  Bird v. Best Plumbing Grp., LLC, 175 Wn.2d 756, 773, 287 P.3d 551 (2012).  There are nine general factors that a court should consider in determining the "reasonableness" of a settlement, none of which are dispositive:

> [T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.

Glover v. Tacoma Gen. Hosp., 98 Wn.2d 708, 717, 658 P.2d 1230 (1983) (alteration in original) (quoting brief), abrogated on other grounds by Crown Controls v. Smiley, 110 Wn.2d

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P**
**Page 4 of 10**

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

695, 756 P.2d 717 (1988). The court's inquiry as to reasonableness is a fact specific one. Wood v. Milionis Construction, Inc., 198 Wn.2d 105, 121, 492 P.3d 813 (2021).

Here, the damages claimed by Stirling are significantly higher than the $100,000.00 settlement offer. Although investigation and discovery are still underway, early estimates indicate that the damages exceed $700,000.00. However, all other relevant factors support the reasonableness of the proposed settlement, in particular those focused on the potential liability of Knutzen.

In terms of proving liability under its various claims, Stirling must establish that Knutzen participated in the actual work that caused the trespass, nuisance, timber trespass, or that is subject to strict liability. See Bradley v. American Smelting and Refining Co., 104 Wn.2d 677, 691, 709 P.2d 782 (1985) (trespass requires proof of an intentional act which resulted in the invasion); Riblet v. Ideal Cement Co., 57 Wn.2d 619, 358 P.2d 975 (1961) (nuisance claim arises from an act that unreasonably interferes with use and enjoyment of property); RCW 64.12.030 (liability extends to those persons who "cut down, girdle, or otherwise injure," timber, trees, or shrubs of another); and Langan v. Valicopters, Inc., 88 Wn.2d 855, 567 P.2d 218 (1977) (strict liability extends to those who undertake an abnormally dangerous activity). The initial facts here indicate that Industrial was the active party in terms of the critical act of applying the herbicides. It controlled all aspects of the work: It chose the product to apply, the method for application, and performed all of the work with its own equipment. Knutzen's participation was limited to retaining Industrial, which it had done on many prior occasions without any issues.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P**
**Page 5 of 10**

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

Despite its lack of direct involvement, there is still a possibility that Knutzen could be vicariously liable for the actions of Industrial. However, those that applied the herbicides were not employees of Knutzen but were instead employees of Industrial. In this, Knutzen will inevitably argue that Industrial was an "independent contractor." Such status arises where one "'contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.'" Kamla v. Space Needle Corp., 147 Wn.2d 114, 119, 52 P.3d 472 (2002) (quoting Restatement (Second) of Agency § 2(3) (1958)). The general rule is that one "is not liable to landowners for the trespasses of the independent contractor or those employed by the independent contractor, whether as agents or independent contractors themselves, unless the trespass is the result of the advice or direction of the principal, or unless the principal has notice of the trespass and fails to interfere." Saddle Mountain Minerals, L.L.C. v. Santiago Homes, Inc., 146 Wn.App. 69, 78, 189 P.3d 821 (2008) (quoting Ventoza v. Anderson, 14 Wn.App. 882, 895, 545 P.2d 1219 (1976)). Stated another way, liability arises where the employer causes or knows of and sanctions illegal conduct. Hickle v. Whitney Farms, Inc., 107 Wn.App. 934, 940, 29 P.3d 50 (2001).

Again, the initial information from Knutzen is that it had historically used Industrial to apply herbicides without issues, including in the at-issue storage space. Knutzen had no active involvement in the application, provided no instructions, and did not participate in any of the decisions associated with the work. Moreover, Knutzen did not become aware of the release until after the event. Accordingly, Stirling's claim as to Knutzen's liability would be weak, while Knutzen's defenses would be strong.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P**
**Page 6 of 10**

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

In addition to this, Knutzen's policy limits are only $100,000.00 for the event, and so it is settling for policy limits. Although there is little doubt that Knutzen has assets that could cover any judgment in excess of the policy limits, Stirling would need to go through collection steps, versus securing the funds early and without any effort or cost.

It is important to recognize that in evaluating the "reasonableness" of the settlement offer, the Court is not required to determine whether Knutzen would be liable. Instead, it only reviews the proposed settlement amount against the potential damages to determine whether it is "reasonable" in the context of Knutzen's potential share of Stirling's damages. Under the circumstances, $100,000.00 is a reasonable amount to contribute towards Stirling's potential damages, given the strength and weaknesses of Stirling's liability claims and Knutzen's defenses.

B.    The Release of All Claims Against Knutzen Does Not Release Industrial.

In addition to finding the settlement amount to be reasonable, Stirling is entitled to confirmation that the release contained in the conditional Settlement Agreement does not release Industrial from the claims made or that could be made by Stirling. RCW 4.22.060(2) provides: "A release, covenant not to sue, covenant not to enforce judgment, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides." Here, the release in the conditional Settlement Agreement provides:

> Notwithstanding the above, nothing herein shall constitute an express or implied waiver or release of any claim that Stirling has or may have in the future against Ventilation, and this Agreement and release shall in no way apply to the claims raised or that may be raised by Stirling against Ventilation in the Action. Stirling reserves any and all claims that it has against

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P**
**Page 7 of 10**

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

Ventilation, including, but not limited to, those claims raised against it by Stirling in the Action.

Exhibit A to Affidavit of Mark J. Lee, p. 3, ¶ 4.

This express language is the opposite of extending any discharge to Industrial. Since the pertinent release language does not provide for a discharge of any claim by Stirling against Industrial, the exception in RCW 4.22.060(2) would not apply, and all claims against Industrial are unaffected by the Settlement Agreement and its release.

C.    All Contribution Claims Against Knutzen Are Discharged.

It is true that Stirling maintains that Industrial and Knutzen (to the extent it is found liable under any of the claims) would be jointly and severally liable in this action. RCW 4.22.070 generally requires the fact finder to apportion "fault" for tort damages amongst all parties that caused the injury, and any defendant will only be liable for his/her/it proportionate share. Here, such an apportionment would occur in the context of Stirling's claims for statutory timber trespass, strict liability, and nuisance because each is included within the definition of "fault" under RCW Chapter 4.22.015. RCW 4.22.015 (fault under tort reform act "includes acts or omissions,...that subject a person to strict tort liability...."); Porter v. Kirkendoll, 194 Wn.2d 194, 207, 208-09, 449 P.3d 627 (2019). Notwithstanding this process, however, defendants remain jointly and severally liable where the plaintiff is found to be fault free. RCW 4.22.070(1)(b). Stirling maintains that this will be the circumstances in this case.

As to the trespass claim, joint and several liability continues to apply in the context of intentional torts. Welch v. Southland Corp., 134 Wn.2d 629, 634, 952 P.2d 162 (1998). A trespass claim is an intentional tort and therefore not subject to the application of RCW

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P**
**Page 8 of 10**

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

Chapter 4.22, and joint and several liability remains.  See <u>Porter v. Kirkendoll</u>, <u>supra</u>, 194 Wn.2d at 207.

Under those claims covered by RCW Chapter 4.22, a jointly and severally liable party has a claim of contribution against another at-fault party.  RCW 4.22.040.  However, this Court's review and determination of the reasonableness of the settlement amount bars any contribution claim that Industrial may have against Knutzen.  RCW 4.22.060(2).  Moreover, by virtue of the fact that the statutory timber trespass, strict liability, and nuisance claims are covered by the Tort Reform Act, Industrial would also have no common law indemnity claim against Knutzen.  RCW 4.22.040(3).[1]

The only potential remaining claim that Industrial could have against Knutzen would be for common law indemnity arising from any liability distinctly and exclusively imposed on Industrial for trespass.  <u>Porter v. Kirkendoll</u>, <u>supra</u>, 194 Wn.2d at 204-05.  However, such a claim could only arise if Knutzen was the "active" tortfeasor, and Industrial was the passive tortfeasor.  <u>Rufener v. Scott</u>, 46 Wn.2d 240, 242-43, 280 P.2d 253 (1955).  The facts here establish that of the two parties, Knutzen was not the active tortfeasor, and therefore the potential for a common law indemnity claim, assuming distinct liability arose exclusively under a trespass claim, is unlikely.

CONCLUSION

Based upon the above, Stirling respectfully requests that this Court issue an order finding and concluding as follows:

---

[1] In reality, it is more likely that Industrial will benefit from the settlement payment by Knutzen.  If it is found to be reasonable, the $100,000.00 will be offset against any judgment against Industrial.  RCW 4.22.060(2).  Since it is more likely that Knutzen will be found fault free, or assigned a small percentage of fault, the $100,000.00 offset will likely be more than what Knutzen would have had to pay under an ultimate judgment.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STIRLING HORT, LLC'S MOTION TO APPROVE REASONABLENESS OF SETTLEMENT WITH DEFENDANT KNUTZEN FARMS, L.P**
**Page 9 of 10**

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

1     1.     that the terms and conditions of the Settlement Agreement, including the

2 $100,000.00 payment from Knutzen, are reasonable;

3     2.     that the Settlement Agreement and its release do not apply to Industrial, and that

4 the claims raised or that could be raised by Stirling against Industrial or any other third party

5 are not waived nor released, and shall continue to be prosecuted herein; and

6     3.     that all contribution or implied indemnity claims that Industrial has or may have

7 in the future against Knutzen are barred.

8     DATED this ___3rd___ day of June, 2022.

9

10

11                                               Mark J. Lee, WSBA #19339

12                                             Haylee J. Hurst, WSBA #51406

                                            Elizabeth Slattery, WSBA #56349

13                                             of Wolf & Lee, LLP

14                                             Attorneys for Plaintiff Stirling Hort, LLC

15

16

17

18

19

20

21

22

23

24

25 **MEMORANDUM OF LAW IN SUPPORT OF**            **WOLF & LEE, LLP**
**PLAINTIFF STIRLING HORT, LLC'S MOTION**        230 E. Champion Street
**TO APPROVE REASONABLENESS OF**           Bellingham, WA 98225
**SETTLEMENT WITH DEFENDANT KNUTZEN**    Ph: (360) 676-0306/Fax: (360) 676-8058
**FARMS, L.P**
Page 10 of 10

# Exhibit B

1

2

3

4

5

6          **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
            **IN AND FOR THE COUNTY OF SKAGIT**

7

8    STIRLING HORT, LLC, a Washington
     limited liability company,                    No. 21-2-00587-29

9                            Plaintiff,            **STIPULATION AND ORDER OF**
                                                   **DISMISSAL OF ALL CLAIMS**
10        vs.                                      **AGAINSTAND ALL**
                                                   **COUNTERCLAIMS OF KNUTZEN**
11   KNUTZEN FARMS, L.P., a Washington             **FARMS, L.P ONLY WITH**
     limited partnership; and INDUSTRIAL           **PREJUDICE AND WITHOUT COSTS**
12   VENTILATION, INC., an Idaho corporation,      **OR FEES**

13                           Defendants.

14

15        It is hereby stipulated by the parties, by and through their undersigned attorneys, that all

16   claims in this action against Defendant Knutzen Farms, L.P. only, and all counterclaims of

17   Defendant Knutzen Farms, L.P. shall be dismissed with prejudice and without any award of

     costs to any party pursuant to CR 41(a)(1)(A) or fees.  This Stipulation shall not affect the
18
     claims of any other party in this action.
19
          DATED this 21ˢᵗ day of July, 2022.
20
     MIX SANDERS THOMPSON, PLLC          WOLF & LEE, LLP
21
                                                              For per email authority
22
     _____    _____
     Mark A. Thompson, WSBA No. 29730    Mark J. Lee, WSBA No. 19339
23   Attorney for Defendant Knutzen Farms, LP   Haylee J. Hurst, WSBA No. 51406
                                         Elizabeth Slattery, WSBA No. 56349
24                                       Attorneys for Plaintiff

STIPULATION AND ORDER OF DISMISSAL – 1

**ORDER**

Based on the foregoing stipulation by counsel,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that all claims in this action against Defendant Knutzen Farms, L.P. only, and all counterclaims of Defendant Knutzen Farms, L.P. are dismissed with prejudice and without an award of costs to any party pursuant to CR 41(a)(1)(A) or fees. This Order shall not affect the claims of any other party in this action.

DONE IN OPEN COURT on this __4__ day of __August__, 2022.

**HEATHER SHAND**
_____
SUPERIOR COURT ~~JUDGE~~/COMMISSIONER

Presented by:

MIX SANDERS THOMPSON, PLLC

_____
Mark A. Thompson, WSBA No. 29730
Attorney for Defendant Knutzen Farms, LP

Approved as to form:

WOLF & LEE, LLP

For per email authority
_____
Mark J. Lee, WSBA No. 19339
Haylee J. Hurst, WSBA No. 51406
Elizabeth Slattery, WSBA No. 56349
Attorneys for Plaintiff

Mix Sanders Thompson PLLC
1420 Fifth Avenue, Suite 2200
Seattle, WA 98101
Tel: 206-521-5989
Fax: 888-521-5980

Exhibit C

**IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR SKAGIT COUNTY**

STIRLING HORT, LLC, a Washington limited liability company,

        Plaintiff,

        vs.

KNUTZEN FARMS, L.P., a Washington limited partnership; and INDUSTRIAL VENTILATION, INC., an Idaho corporation,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 21-2-00587-29

COMPLAINT FOR TRESPASS, NUISANCE, STATUTORY WASTE, TIMBER TRESPASS, STRICT LIABILITY, AND NEGLIGENCE

        COMES NOW Plaintiff Stirling Hort, LLC ("Stirling"), by and through its attorneys of record, Wolf & Lee, LLP, and by way of Complaint for Trespass, Nuisance, Statutory Waste, Timber Trespass, Strict Liability, and Negligence, alleges, claims, and prays as follows:

        I.      <u>PARTIES & JURISDICTION</u>

        1.1    Stirling is a Washington limited liability company and leases a portion of the real property legally described in Exhibit A, which is attached hereto and incorporated by reference, which is located in Skagit County ("Property"). That portion of the Property leased by Stirling comprises that area described as follows:

**COMPLAINT FOR TRESPASS, NUISANCE, STATUTORY WASTE, TIMBER TRESPASS, STRICT LIABILITY, AND NEGLIGENCE
Page 1 of 11**

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

"approximately 744 square feet of interior floor area, identified as Suite 1,…. The Premises are a portion of a building (herein referred to as the 'Building') commonly known as 'Building A' and which is located at 15612 Best Road, Mount Vernon, WA 98273…." ("Premises").

1.2     Defendant Knutzen Farms, L.P. is a Washington limited partnership that, based upon knowledge and belief, grows, harvests, and sells potatoes in and around Skagit County, Washington ("Knutzen").

1.3     Defendant Industrial Ventilation, Inc., is an Idaho corporation registered and licensed to do business in the state of Washington ("Industrial").

1.4     This matter concerns damage to and destruction of Stirling's marijuana plants and product that was being grown and processed at the Premises. Venue is proper pursuant to RCW 4.12.020(3), as the subject plants and product were damaged while in the Premises and thereby located in Skagit County, Washington. Venue is separately appropriate based upon the fact that the principal place of business for Knutzen is Skagit County, Washington, and both Defendants transacted business in Skagit County, Washington. RCW 4.12.025(3). This Court has jurisdiction over the Defendants, as Washington is Knutzen's principal place of business, Industrial transacts business in the state of Washington, and both committed a tortious act in the state of Washington. RCW 4.28.185.

## II.     FACTS

2.1     Stirling restates and incorporates by reference the allegations contained in paragraphs 1.1 through 1.4 herein.

2.2     Stirling has secured the right to grow, process, and sell marijuana pursuant to Marijuana Producer Tier 2 License No. 416060 ("License") issued by the Washington State Liquor and Cannabis Board ("LCB").  The License is attached to and associated with the Property, which is leased by James Easterlin, d.b.a. Stirling Horticulture, pursuant to the May 2016 Building Lease with John and Toni Christianson, a true and correct copy of which is attached hereto and incorporated by reference as Exhibit B.

2.3     In or about 2017, Stirling began to locate seeds and mother plants on the Premises to commence production under the License.  Based upon knowledge and belief, in 2018, Knutzen located harvested potatoes for storage in a separate building on the Property and adjacent to the Premises.

2.4     Based upon knowledge and belief, Knutzen retained Industrial to fumigate the potatoes being stored on the Property.  Industrial conducted such work on or about November 3, 2018, December 7, 2018, and December 8, 2018.

2.5     Based upon knowledge and belief, herbicides were applied for the purpose of controlling sprouts on the potatoes.  The materials were applied in an aerosol state and included IVI CIPC Aerosol, which was applied during the November 3, 2018, and December 8, 2018 applications.  The active ingredient in IVI CIPC is Chlorpropham.  In addition, 1,4ZAP® was applied on December 7, 2018.  Under the label for this product, the active ingredient is also Chlorpropham.

2.6     The storage area where the potatoes were located shared a common wall with an organic certified food cooperative called the Food Hub.  The Food Hub's

WOLF & LEE, LLP
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

space is at the end of the building and directly across a parking area from the Premises.

2.7    On or about December 10, 2018, the Food Hub experienced significant infiltration of the herbicides applied to the Knutzen potatoes through the common wall. The Food Hub immediately opened all of the doors and windows in the space and ran fans to remove the chemicals.

2.8    On April 3, 2019, the LCB conducted an inspection of Stirling's facility and took three samples from the grow rooms and one from the drying room for testing. The test results all identified the presence of Chlorpropham in amounts exceeding the state action levels.    Based upon these test results, the LCB took possession and destroyed all of Stirling's plants, seeds, and product located at the Premises.    The destroyed product included 49.5 kg of dried product, of which 70 percent was grade A bud, and 30 percent was grade B bud; 965 plants at 680.385 grams of bud per plant, of which 70 percent was grade A bud, and 30 percent was grade B bud; and plant byproduct for the 965 plants .35 per gram.

2.9    Based upon knowledge and belief, Stirling's products were contaminated by the herbicides applied to Knutzen's potatoes when they were ventilated out of the Food Hub and then penetrated the Premises.    Such caused Stirling's plants and products to have Chlorpropham at amounts exceeding state levels, and correspondingly caused the LCB to take and destroy all of Stirling's product and plants.

WOLF & LEE, LLP
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

2.10   Release of the herbicides was caused by the failure of Defendants to adequately seal the Knutzen storage room.  Based on knowledge and belief, the storage room should have been completely sealed off and self-contained to prevent the herbicides from being released into the environment.  Defendants knew or should have reasonably known that the herbicides should not have been released into the environment, and that such release could cause damages to other agricultural plants.

2.11   At all material times, Knutzen participated, authorized, and/or directed the actions of Industrial, or caused, knew, or sanctioned the actions of Industrial.

III.   FIRST CAUSE OF ACTION - TRESPASS

3.1   Stirling restates and incorporates by reference paragraphs 1.1 through 2.11 herein.

3.2   Under Bradley v. American Smelting and Refining Co., 104 Wn.2d 677, 709 P.2d 782 (1985), to recover under a trespass theory based on the deposit of airborne particulates into Stirling's Premises and onto its plants and products:

> a plaintiff must show: 1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and (4) substantial damages to the *res*.

Id. at 691.  The intent element requires "a volitional act undertaken with the knowledge and substantial certainty that reasonably to be expected consequences would follow." Id. at 683.

3.3   Defendants, and/or persons for whom Defendants are vicariously liable, have unlawfully invaded Stirling's interest in its exclusive possession of the Premises

COMPLAINT FOR TRESPASS, NUISANCE, STATUTORY WASTE, TIMBER TRESPASS, STRICT LIABILITY, AND NEGLIGENCE Page 5 of 11

by depositing herbicides into Stirling's Premises and onto its plants and products, all without permission, authority, or right. Such acts were intentional and undertaken with the knowledge and substantial certainty that the chemicals would escape the storage space and drift into the Premises, and with a reasonable foreseeability that such acts would disturb Stirling's possessory interests. Such acts have caused substantial damage to and continue to infect the Premises, marijuana plants and product, the effects of which are ongoing and continuing in nature. Stirling has suffered, and will continue to suffer, damages from such trespass in an amount to be determined by the trier of fact herein.

3.4    Defendants' actions and trespasses have caused, and will continue to cause, Stirling to suffer actual and substantial harm, and damages in an amount to be determined by the trier of fact herein.

## IV.    SECOND CAUSE OF ACTION – NUISANCE

4.1    Stirling restates and incorporates by reference paragraphs 1.1 through 3.4 herein.

4.2    Defendants, and/or persons for whom Defendants are vicariously liable, intentionally applied herbicides to the potatoes located in the storage area in such a manner that caused the herbicides to invade the Premises. Such acts have unreasonably interfered with Stirling's use and enjoyment of the Premises and constitute a nuisance under RCW 7.48.010 and Riblet v. Ideal Cement Co., 57 Wn.2d 619, 358 P.2d 975 (1961). Defendants' application of herbicides in a manner that caused it to drift into the Premises was unreasonable. Such acts have damaged

COMPLAINT FOR TRESPASS, NUISANCE,
STATUTORY WASTE, TIMBER TRESPASS,
STRICT LIABILITY, AND NEGLIGENCE
Page 6 of 11

WOLF & LEE, LLP
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

Stirling's marijuana plants and product, and substantially interfered with Stirling's use and enjoyment of the Premises and the injured plants, and Stirling's ability to farm product in the Premises.

4.3    Defendants' actions and nuisances have caused, and will continue to cause, Stirling to suffer actual and substantial harm and damages in an amount to be determined by the trier of fact herein.

V.    THIRD CAUSE OF ACTION – TIMBER TRESPASS
UNDER RCW 64.12.030

5.1    Stirling restates and incorporates by reference paragraphs 1.1 through 4.3 herein.

5.2    Defendants, and/or persons for whom Defendants are vicariously liable, have injured trees, timber, and/or shrubs on the Premises without lawful authority. Such actions by Defendants were "willful" and were not casual or involuntary.

5.3    Stirling is entitled to recover all damages caused by Defendants, and/or persons for whom Defendant are vicariously liable, for timber trespass under RCW 64.12.030, in an amount to be determined by the trier of fact herein, and further entitled to have all such damages trebled based upon the willful acts of Defendants, all which were not casual or involuntary.

VI.    FOURTH CAUSE OF ACTION – STRICT LIABILITY

6.1    Stirling restates and incorporates by reference paragraphs 1.1 through 5.3 herein.

6.2    Defendants' application of herbicides is an abnormally dangerous activity subject to strict liability under Langan v. Valicopters, Inc., 88 Wn.2d 855, 567 P.2d 218

COMPLAINT FOR TRESPASS, NUISANCE,
STATUTORY WASTE, TIMBER TRESPASS,
STRICT LIABILITY, AND NEGLIGENCE
Page 7 of 11

WOLF & LEE, LLP
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

(1977). In determining whether an act is "abnormally dangerous" for purposes of strict liability, the following factors are considered:

(a) Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others;

(b) Whether the gravity of the harm which may result from it is likely to be great;

(c) Whether the risk cannot be eliminated by the exercise of reasonable care;

(d) Whether the activity is not a matter of common usage;

(e) Whether the activity is inappropriate to the place where it is carried on; and

(f) The value of the activity to the community.

Id. at 861.

6.3 Defendants' application of herbicides to the unsealed storage room adjacent to the Premises and other agricultural activities involves a high degree of risk of injury to, inter alia, Stirling, and its marijuana plants and product located in the Premises. The gravity of harm which would result from the drift of herbicides into Stirling's Premises is likely to be great, as the chemicals applied by Defendants were toxic to marijuana plants and product. The risk of drift or contamination of Stirling's marijuana plants and product cannot be eliminated by the exercise of reasonable care. The application of the herbicides in the manner and of the type used by Defendants is not a matter of common usage in the community. The application of herbicides toxic to agricultural products, including marijuana plants and products, is inappropriate in a storage facility that is not completely sealed. The social value of applying herbicides

WOLF & LEE, LLP
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

to control sprouts to a private inventory of potatoes is outweighed by the risk of harm to other agricultural products, including Stirling's marijuana plants and products. Defendants are strictly liable for damages proximately caused by the applications of herbicides.

6.4   Defendants' applications of herbicides was the proximate cause of damage to Stirling, including, but not limited to, injury to Stirling's marijuana plants and product.

6.5   Defendants' actions have caused, and will continue to cause, Stirling to suffer actual and substantial harm and damages in an amount to be determined by the trier of fact herein.

## VII.   FIFTH CAUSE OF ACTION – NEGLIGENCE

7.1   Stirling restates and incorporates by reference paragraphs 1.1 through 6.5 herein.

7.2   7 U.S.C. § 136j(2)(G) of the Federal Insecticide and Environmental Pesticide Control Act declares that it is unlawful "to use any registered pesticide in a manner inconsistent with its labeling."

7.3   RCW 15.58.150(2)(c) of the Washington Pesticide Control Act provides that: "It shall be unlawful:...[f]or any person to use or cause to be used any pesticide contrary to label directions or to regulations of the director if those regulations differ from or further restrict the label directions...."

7.4   RCW 17.21.150(4) declares that it is a violation of the Washington Pesticide Application Act to "[o]perate[] in a faulty, careless, or negligent manner."

COMPLAINT FOR TRESPASS, NUISANCE,
STATUTORY WASTE, TIMBER TRESPASS,
STRICT LIABILITY, AND NEGLIGENCE
Page 9 of 11

WOLF & LEE, LLP
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

7.5     WAC 16-228-1220(5) provides that: "No person shall apply pesticides if weather conditions are such that physical drift or volatilization may cause damage to adjacent land, humans, desirable plants or animals."

7.6     WAC 16–228–1220(2) provides that: "No person shall transport, handle, store, load, apply, or dispose of any pesticide, pesticide container or apparatus in such a manner as to pollute water supplies or waterways, or cause damage or injury to land, humans, desirable plants and animals, or wildlife."

7.7     At all material times hereto, Defendants owed Stirling a duty to use reasonable and ordinary care in applying herbicides on the potatoes, including, but not limited to, those duties imposed by statutes and regulations, and also in a manner to avoid injury to Stirling's marijuana plants and products.  Defendants breached this duty by, inter alia, applying pesticides against labeling instructions and in weather conditions conducive to drift, and/or in a manner that resulted in drift into Stirling's Premises, and by failing to comply with applicable laws and regulations.  Defendants' breaches were the proximate cause of damage to Stirling's property.  Such actions and inactions by Defendant constitute negligence.

7.8     Chlorpropham, which is toxic or prohibited to marijuana plants and products, would not ordinarily be found in marijuana plant tissue in the absence of negligence.  At all material times hereto, herbicides containing Chlorpropham were applied by Defendants to a storage area within the exclusive control of Defendants.  In no way did Stirling contribute to the occurrence of Chlorpropham on the marijuana plants or products.  Such actions and/or inactions by Defendants entitle Stirling to an

COMPLAINT FOR TRESPASS, NUISANCE,
STATUTORY WASTE, TIMBER TRESPASS,
STRICT LIABILITY, AND NEGLIGENCE
Page 10 of 11

WOLF & LEE, LLP
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

inference of negligence under the doctrine of res ipsa loquitur and constitute negligence.

7.9    Defendants' negligence has caused Stirling to suffer actual and substantial harm and damages in an amount to be determined by the trier of fact herein.

WHEREFORE, having stated claims for relief, Stirling prays as follows:

1.    for judgment against Defendants, jointly and severally, in the amount of all damages found by the trier of fact herein;

2.    for judgment trebling all damages found by the trier of fact herein;

3.    for an award of Stirling's attorneys' fees and costs against Defendants as allowed by statute, contract, law, or equity; and

4.    for such other relief as the Court deems just and proper.

DATED this _28th_ day of September, 2021.

Mark J. Lee, WSBA #18339
Haylee J. Hurst, WSBA #51406
Elizabeth Slattery, WSBA #56349
Wolf & Lee, LLP
Attorneys for Plaintiff Stirling Hort, LLC

**COMPLAINT FOR TRESPASS, NUISANCE,
STATUTORY WASTE, TIMBER TRESPASS,
STRICT LIABILITY, AND NEGLIGENCE**
Page 11 of 11

**WOLF & LEE, LLP**
230 E. Champion Street
Bellingham, WA 98225
Ph: (360) 676-0306/Fax: (360) 676-8058

EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

Lot 1, Short Plat No. 23-83, approved April 23, 1983 and recorded May 24, 1983, under Auditor's File No. 8305240001 in Volume 6 of Short Plats, page 63, records of Skagit County, Washington; being a portion of the North ½ of the Southeast ¼ of Section 20, Township 34 North, Range 3 East, W.M.  Situate in the County of Skagit, State of Washington.

# EXHIBIT B

# BUILDING LEASE

1.     <u>Parties</u>. This Lease (the "Lease"), is made and entered into effective May ___, 2016, by and between **JOHN CHRISTIANSON and TONI CHRISTIANSON**, husband and wife, ("Landlord") and **STIRLING HORTICULTURE** and, **JAMES EASTERLIN**, a single man, as his separate property, (collectively the "Tenant").

2.     <u>Premises</u>. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord upon the terms and conditions herein set forth that certain space (the "Premises") containing approximately 744 square feet of interior floor area, identified as Suite 1, as shown in *blue* on the drawing attached hereto as Exhibit "A" and incorporated herein by this reference. The Premises are a portion of a building (herein referred to as the "Building") commonly known as "Building A" and which is located at 15612 Best Road, Mount Vernon, WA 98273 and situated upon the real property legally described in Exhibit "B" attached hereto and incorporated herein by this reference (the "Real Property").

Tenant shall have non-exclusive use of certain portions of the Real Property (the "Common Areas"), as defined below in Section 5. As Tenant is one of multiple tenants of the Real Property, Tenant's use of the Common Areas shall not interfere with the use of the Common Areas by Landlord and Landlord's other tenants.

3.     <u>Lease Term and Commencement Date</u>. This Lease shall be for a term of three (3) years (the "Lease Term") and shall commence on June 1, 2016, (the "Commencement Date") and shall end on May 31, 2019 (the "Termination Date"). Landlord agrees to deliver the Premises to Tenant on or before the Commencement Date, for the purposes of Tenant conducting improvements, inspection, or completion of Tenant's work or for other purposes, and in such event, Tenant covenants and agrees that such entry before or after the Commencement Date shall be deemed to be under all of the terms, covenants, conditions, and provisions of this Lease, including without limitation the provisions relating to insurance and indemnification.

4.     <u>Rent</u>

    4.1     <u>Base Rent</u>. Beginning on the Commencement Date, and running for the first 24 months of the Lease Term, Tenant agrees to pay Landlord as Base Rent, without notice or demand, monthly rent in the amount of Four Hundred Sixteen and 67/100 Dollars ($416.67) per month. For months 25 through 36 of the Lease Term, Base Rent shall be increased to Eight Hundred Thirty-Three and 34/100 Dollars ($833.34) per month. Base Rent is payable in advance on or before the first day of each month of the Lease Term. Rent for any portion during the term hereof which is for less than one month shall be a prorated portion of the Base Rent. All rent shall be paid to Landlord without deduction or offset in lawful money of the United States of America at such place as Landlord may from time to time designate in writing. Additional charges as described in Section 4.4 herein (the "Additional Rent") shall be paid at the same time and in accordance with the terms of this Section 4.

    4.2     <u>Prepaid Rent</u>. Upon execution of this Lease, Tenant shall deliver to Landlord the sum of $1,250.01 as prepaid rent, to be applied to the base rent due for the months of July, 2016, and June, 2019.

Initials

4.3     Interest.    In the event that any sums due hereunder, including Base Rent, Additional Rent, or any other sums are not paid when due, interest at the rate of 12 percent per annum shall accrue from the date due until all rent or other sums and interest have been paid in full. Acceptance by Landlord of partial payment of rent, interest, or any other sums due hereunder shall not constitute a waiver of any remaining unpaid rent, interest, or other sums.

4.4     Additional Rent.    In addition to the Minimum Rent, beginning on the Commencement Date, Tenant shall pay to Landlord the following Additional Rent:

4.4.1    Real Estate Taxes, Insurance, and Operating Expenses.    Tenant shall pay Tenant's percentage share of the total cost of the items described below. Tenant's percentage share of such items shall be an agreed two percent, (2%), based upon Tenant's occupation of approximately 744 square feet of interior space for Suite 1 of a total of approximately 37,400 rental square feet of all buildings on the Premises ("Tenant's Percentage Share"). If additional buildings or additions to existing buildings are constructed in the future, Tenant's Percentage Share will be adjusted to reflect Tenant's share of total Building area.

4.4.1.1    Real Estate Taxes.    All real estate taxes imposed or assessed against the Premises, the Building, or the Real Property, including without limitation any installments payable for any improvement assessments, personal property taxes, and any and all other governmental charges, general or special, ordinary or extraordinary, of any kind and nature whatsoever, including without limitation surcharges levied or assessed upon parking spaces or areas and payments to public transit or carpooling facilities required by any governmental agency.

4.4.1.2    Insurance.    Any and all insurance premiums including fire, extended coverage, public liability, boiler, elevator, difference in conditions, property damage, and other insurance premiums as such amounts relate to the Premises, the Building, and the Real Property and as provided in Section 14.

4.4.1.3    Operating Expenses.    Any and all costs and expenses directly related to and incurred by Landlord in connection with the repair, operation, and maintenance of the Building, including interior and exterior maintenance, all costs to maintain, repair, and replace Common Areas, including covered and uncovered parking areas, sidewalks, driveways, and all other areas used in common by tenants of the Building; all reasonable costs to supervise and administer the maintenance of the Building and the Real Property, including the Common Areas, and such fees as may be paid to a third party in connection with such supervision, or a fee to Landlord or Landlord's designee to supervise and administer the maintenance of the Building and the Real Property, including the Common Areas; wages, salaries, and benefits of personnel engaged in the management, operation, maintenance, or repair of the Building and the Real Property; the costs of the annual determination of the operating expenses, the amortization of capital investments made to reduce operating costs, and the amortization of extraordinary repairs made to extend the life of the Building in accordance with generally accepted operational and maintenance procedures; all costs of any services furnished by Landlord, including janitorial, security, and landscaping services, and related costs and expenses; license, permit, and inspection fees; the cost of supplies, materials, equipment, and tools used in connection with the maintenance, operation, or repair of the Building and the Real Property; and all other costs and expenses related to the operation, maintenance, and repair of the Building and the Real Property.

4.4.2    Calculation and Payment of Additional Rent.    On the Commencement Date, Landlord shall submit to Tenant a statement of the anticipated monthly Additional Rent for the period between the Commencement Date and the following January, and Tenant shall pay the same and

all subsequent monthly payments on the first day of every month. Tenant shall continue to make said monthly payments until notified by Landlord of a change thereof. On March 1 of each year or as soon thereafter as practicable, Landlord shall give Tenant a statement showing the total Additional Rent for the prior calendar year and Tenant's Percentage Share thereof, prorated from the Commencement Date. In the event the total of the monthly payments which Tenant has made for the prior calendar year is less than the actual amount of Tenant's Percentage Share of such total Additional Rent, then Tenant shall pay the difference in a lump sum within ten days after receipt of a statement from Landlord for the same. Tenant shall thereafter pay the amount of monthly payments which are then calculated as the monthly Additional Rent based on the prior year's experience. Any overpayment by Tenant shall be credited toward the next monthly Additional Rent coming due or reimbursed to Tenant if determined after the Termination Date. Landlord shall provide to Tenant an accounting of such calculations upon demand by Tenant.

    4.4.3 <u>Change in Method of Taxation</u>. If, at any time during the term of this Lease, the present method of taxation is changed so that in lieu of or in addition to the whole or any part of any taxes, assessments, or charges levied, assessed, or imposed upon real estate and the improvements thereon, there is levied, assessed, or imposed on Landlord a capital levy, or other tax directly on the rents received or a franchise tax assessment, levy, or charge measured by or based, in whole or in part, upon such rents for the present or any future building or buildings on the Real Property or any other tax or assessment, levied or assessed in lieu of or in addition to present taxes, assessments, or charges, then all such other or additional taxes, assessments, levies, or charges will be deemed to be included within the term "real estate taxes" for the purposes hereof. In the event such items cannot lawfully be reimbursable by Tenant, Landlord shall have the option to terminate this Lease.

    5. <u>Common Areas</u>. The following areas adjacent to or located in or on the Premises, the Building, or the Real Property shall constitute the Common Areas available for Tenant's nonexclusive use, including without limitation: the driveways, landscaped areas and grounds, parking areas, and all other areas used in common by the Landlord, other tenants of Landlord, and all invitees, and employees of the tenants located at the Property, collectively the "Commons Areas." All Common Areas shall be subject to Landlord's sole management and control and shall be operated and maintained in such manner as Landlord, in Landlord's sole discretion, shall determine. Landlord may, from time to time in consultation with Tenant, alter, modify, or change the dimensions, location, size, and shape of the Common Areas. Tenant and others entitled or allowed to use the Common Areas shall be subject to and shall comply with such rules and regulations as may be established by Landlord from time to time.

    It is specifically agreed by the Parties that the well located near the southwest corner of the Building (the "well") shall fall outside the definition of the Premises, except to the extend it provides water to the Building, and the well shall be part of the Common Areas and all rights of use and access to the well shall remain with Landlord and Landlord's agents and other tenants as Landlord, in Landlord's sole discretion, shall determine. Tenant agrees that the Common Areas immediately surrounding the Building shall be used at all times by Tenant consisted with this Section 5 and in such a manner as shall not interfere with the use and maintenance of the well.

    6. <u>Security Deposit</u>. In consideration of this Lease, Tenant has deposited with Landlord the sum of $1,000.00. Said sum shall be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants, and conditions of this Lease to be kept and performed by Tenant during the term hereof. If Tenant defaults with respect to any provision of this Lease, including without limitation the provisions relating to payment of rent, Landlord may (but shall not be required to) use all or any part of this security deposit for payment of any rent or any other sum in default or for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's default or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's

default. If any portion of said deposit is so used or applied, Tenant shall, within five days after written demand thereof, deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount, and Tenant's failure to do so shall be a default under this Lease. Landlord shall not be required to keep the security deposit separate from Landlord's general funds. Landlord shall receive any and all interest accruing on such deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by Tenant, the security deposit or any balance thereof shall be returned to Tenant or, at Landlord's option, to the last assignee of Tenant's interest hereunder (within ten days following expiration of the Lease Term). In the event of termination of Landlord's interest in this Lease, Landlord shall transfer said deposit to Landlord's successor in interest. The use by Landlord of all or a portion of the security deposit shall not constitute a limitation on Tenant's liability.

7. Early Termination of Lease Term. Landlord agrees to allow Tenant to terminate this lease early if the Washington State Liquor Control Board, or any other government agency or authority disallows Stirling Horticulture, Stirling Hort. LLC and/or James Easterlin or assigns from growing or processing marijuana at the Premises. To exercise its option for early termination of this Lease, Tenant will inform Landlord in writing of such disapproval by said governmental agency and Tenant will thereafter be required to pay one month's additional rent beyond the current month in which the early termination notice is provided and to complete any improvements or installations currently in process by Tenant, at which time this Lease shall be terminated.

8. Use of Premises. Tenant's use and occupancy of the Premises shall be for the production, processing and/or storage of cannabis. As the Premises are being used by Tenant for a purpose related to cannabis, Tenant shall ensure that no cannabis related smell or other offensive odors shall emanate from the Premises and affect the business of Landlord or of any of Landlord's other tenants. Tenant shall take all steps necessary to remediate any such issues should they develop. Tenant shall not use or permit the Premises to be used for any other purpose without the prior written consent of Landlord.

8.1 Uses Prohibited. No retail sales shall be made on the Premises. Tenant shall not do or permit anything to be done in or about the Premises nor bring or keep anything therein which will in any way increase the existing rate of or affect any fire or other insurance upon the Building or any of its contents or cause a cancellation of any insurance policy covering the Building or any part thereof or any of its contents. Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other tenants or occupants of the Building or Property or injure or annoy them or use or allow the Premises to be used for any improper, immoral, unlawful, or objectionable purpose, nor shall Tenant cause, maintain, or permit any nuisance in, on, or about the Premises. Tenant shall not commit or allow to be committed any waste in or upon the Premises. Tenant shall not cause or permit any hazardous or toxic substance, material, or waste, including without limitation any oil, pollutant, contaminant, hazardous material, dangerous waste, extremely hazardous waste, toxic waste, asbestos, air pollution, or other hazardous or toxic substance, as such term or similar term is now or hereafter defined, used, or understood in or under any federal, state, local, or other governmental statute, rule, ordinance, order, or regulation in violation of any federal, state, local, or other governmental statute, rule, ordinance, order, or regulation which relates in any way to the protection of the environment.

Tenant shall indemnify and hold Landlord harmless from and against any claim, cost, damage, and expense, including attorneys' fees, monitoring costs, response costs, and penalties with respect to any breach of these covenants by Tenant, which indemnification shall survive termination of the Lease Term. Landlord shall indemnify and hold Tenant harmless from and against any claim, cost, damage, and expense, including attorneys' fees, monitoring costs, response costs, and penalties, arising during or after the term of this Lease from or in connection with the presence or suspected presence of toxic or hazardous

substances except to the extent such substances are present as the result of Tenant's use, occupancy, and possession of the Premises. Landlord's indemnification shall survive the expiration or earlier termination of the Lease.

8.2    <u>Compliance with Law</u>. Tenant shall not use or permit the use of the Premises in any way in conflict with any law or governmental rule. Tenant shall, at Tenant's sole cost, promptly comply with all such laws and governmental rules and with the requirements of any board of fire underwriters or other similar bodies now or hereafter constituted relating to the condition, use, or occupancy of the Premises whether or not expressly ordered to do so by the applicable governmental authority. The judgment of any court of competent jurisdiction or the admission of Tenant in any action against Tenant that Tenant has violated any law or governmental rule, whether or not Landlord is a party, shall be conclusive of that fact as between Landlord and Tenant. Notwithstanding the forgoing, as Tenant is engage in business related to cannabis, Tenant's failure to comply with federal law(s) shall not constitute a default of Tenant's obligations under the terms of this Lease.

8.3    <u>Use of Parking Areas</u>. Parking areas shall be used for vehicle parking only and not for storage, and garbage and refuse awaiting collection shall be stored only in dumpster-type containers which shall be placed in areas away from public view.

9.    <u>Alterations and Additions</u>.

9.1    Tenant shall not make or allow to be made any alterations, improvements, or changes to or of the Premises, except for what constitutes emergency repairs, or any part thereof without the prior written consent of Landlord, and all improvements, alterations, or changes so made shall become a part of the leased Premises and shall belong to Landlord upon expiration or sooner termination of this Lease. In the event Landlord consents to the making of any alterations, additions, or improvements to the Premises by Tenant, the same shall be made by Tenant, at Tenant's sole cost and expense, including but not limited to any cost or expense associated with any permits, tenant improvements, etc. in or about the Premises.

9.2    The foregoing notwithstanding, it is agreed by the parties that Tenant, at Tenant's sole cost and expense, shall be approved by Landlord to make the following alterations and/or additions to the Premises, Building and Real Property, which shall all be completed in a proper workmanlike manner with all necessary permitting and inspection, and which additions and/or alterations shall include the following:

9.2.1    Tenant is allowed to install a four inch (4") sanitary sewer line from Suite 2 of the Building to the Landlord's septic tank which services the Building. Such installation shall be completed below grade, properly permitted and shall be completed in a proper and workmanlike manner;

9.2.2    Tenant is allowed to install power line(s) from the nearest power pole across the Real Property to the Building to service Suites 1 and 2. Landlord agrees to authorize and sign for any state electrical permit needed for such electrical service installation, which includes for lines, breaker panel(s) and interior electrical distribution in the Building. Tenant is allowed to install a power pole on the Real Property, if required by Puget Sound Energy, in a location mutually approved by Landlord, Tenant and Puget Sound Energy.

9.2.3    Tenant is allowed to install doors, walls, beams and posts both structural and nonstructural to the Building, as needed by Tenant and as required to maintain the structural integrity

of the Building. Tenant shall also be approved to make repairs to the roof of the Building as needed to maintain integrity of the roof and roof trusses of the Building.

9.2.4   Tenant is allowed to keep security personnel vehicles on the Real Property, parked on the west side of the Building 24 hours per day during the Lease Term, as it may be extended. Such vehicles shall not include those designed for recreational living without Landlord's additional written approval.

9.2.5   Tenant is allowed to install a bathroom and needed plumbing and electrical service to the Building.

9.2.6   Tenant is allowed to install fencing around the exterior Premises which is an area 30 feet by 60 feet adjacent to the west side of the Building, as depicted on the attached Exhibit "A." Tenant shall be allowed to bring in gravel to maintain said fenced area and shall be afforded vehicular access to such area at all times. Within said fenced area, Tenant is allowed to set a portable office building.

10.   Maintenance and Repairs.  Responsibility for maintenance and repairs shall be allocated between Landlord and Tenant as follows:

10.1   Tenant's Obligations.  The parties agree that the condition of the premises has been taken into account in the negotiation of the amount of rent to be paid. As such, Tenant shall, at Tenant's expense, repair and maintain the structural portions of the Building, including the exterior walls, roof, and foundation. By taking possession of the Premises, Tenant shall be deemed to have accepted the Premises as being clean and in good order, condition, and repair. Tenant shall, at Tenant's sole cost and expense, keep the Premises and every part thereof in good condition and repair (except as hereinafter provided with respect to Landlord's obligations), including without limitation the maintenance, replacement, and repair of any doors, windows, window casements, plumbing, pipes, electrical wiring, and conduits. Tenant shall, upon the expiration or sooner termination of this Lease, surrender the Premises to Landlord in good condition, broom clean, ordinary wear and tear and damage from causes beyond the reasonable control of Tenant only excepted. Any damage to adjacent premises caused by Tenant's use of the Premises shall be repaired at the sole cost and expense of Tenant.

10.1.1   ~~Use of Landlord's Contractor.   Tenant shall obtain Landlord's~~ written ~~approval with respect to a choice of contractor before Tenant undertakes the making of any repairs hereunder, which approval shall not be unreasonably withheld.~~

10.2   Landlord's Obligations.  The parties agree that Landlord shall have no obligation for maintenance or repair of the exterior or roof of the Building, which burden shall rest with the Tenant, at Tenant's sole cost and expense. In the event the Building of which the Premises are a part is occupied by third parties, in addition to Tenant, and in the event such maintenance and repairs are necessitated in whole or in part by the acts, neglect, fault, or omission of any duty by Tenant, Tenant's agents, servants, employees, or invitees, or any damage caused by breaking and entering, Tenant shall pay to Landlord the entire cost of such maintenance and repairs. There shall be no abatement of rent and no liability of Landlord by reason of any injury to or interference with Tenant's business arising from the making of any repairs, alterations, or improvements in or to any portion of the Building or the Premises or in or to fixtures, appurtenances, and equipment. Tenant waives the right to make repairs at Landlord's expense under any law, statute, or ordinance now or hereafter in effect.

11.    Liens. Tenant shall keep the Premises and the Real Property on which the Premises are situated free from any liens arising out of any work performed, materials furnished, or obligations incurred by Tenant. Landlord may require, at Landlord's sole option, that Tenant shall provide Landlord, at Tenant's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of any improvements, additions, or alterations in the Premises which Tenant desires to make with Landlord's prior consent, to insure Landlord against any liability from mechanics' and materialmen's liens, and to insure completion of the work. On final determination of the lien and claim for lien, Tenant shall immediately pay any judgment rendered, together with all proper costs and charges, and shall have the lien released or judgment satisfied at no cost to Landlord.

12.    Hold Harmless. To the extent permitted by law, and except to the extent of Landlord's negligent acts or omissions, Tenant shall indemnify and hold harmless Landlord from and against any and all claims arising from Tenant's use of the Premises or from the conduct of Tenant's business or from any activity, work, or other things done, permitted, or suffered by Tenant in or about the Premises, and shall further indemnify and hold harmless Landlord from and against any and all claims arising from any breach or default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease or arising from any act or negligence of Tenant or any officer, agent, employee, guest, or invitee of Tenant, and from all costs, attorneys' fees, and liabilities incurred in or about the defense of any such claim or any action or proceeding brought thereon. In any action or proceeding brought against Landlord by reason of such claim, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. This indemnification shall survive termination of this Lease. To the extent permitted by law, Tenant hereby assumes all risk of damage to property or injury to persons in, upon, or about the Premises from any cause other than the negligence of Landlord, and Tenant hereby waives all claims in respect thereof against Landlord. Landlord or Landlord's agents shall not be liable for any loss or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, or rain which may leak from any part of the Building or from the pipes, appliances, or plumbing works therein or from the roof, street, or subsurface, or from any other place resulting from dampness, or from any other cause whatsoever, unless caused by or due to the negligence of Landlord or Landlord's agents. Landlord or Landlord's agents shall not be liable for interference with the light or air, or for any latent defect in the Premises. Tenant shall give prompt notice to Landlord in case of casualty or accidents in the Premises.

13.    Subrogation. As long as their respective insurers so permit, Landlord and Tenant hereby mutually waive their respective rights of recovery against each other for any loss insured by fire, extended coverage, and other property insurance policies existing for the benefit of the respective parties. Each party shall apply to their insurers to obtain said waivers. Each party shall obtain any special endorsements, if required by their insurer, to evidence compliance with the aforementioned waiver.

14.    Insurance

14.1    Casualty Insurance. Tenant shall obtain and maintain in full force insurance coverage for the Premises in an amount equal to the replacement cost of that portion of the Building representing the Premises. Policy shall include, fire, extended coverage and special form causes of loss. At Landlord's sole option, the policy shall include twelve month loss of rents and building ordinance or code change for all or any portion of the Building or Premises. The building replacement amount of insurance shall include all leasehold improvements and apply on an agreed amount basis with any reference to co-insurance or similar penalty eliminated. Landlord shall be listed as an additional insured and loss payee under the policy. Tenant shall deliver to Landlord, prior to right of entry, certified copy of the original policy evidencing the existence and amounts of insurance satisfactory to Landlord. Policy

shall be endorsed to provide Landlord thirty (30) days prior written notice in the event of termination or reduction in coverage.

14.2    Liability Insurance. Tenant shall, at Tenant's sole expense, obtain and keep in force during the term of this Lease a policy of comprehensive public liability insurance insuring Tenant and, as an additional insured, Landlord, against any liability arising out of the ownership, use, occupancy, or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be in amount not less than $1,000,000.00 Combined Single Limit with respect to injuries to or death of persons and/or destruction of or damage to property, and shall insure performance by Tenant of the indemnity provisions of Section 12 herein and all other assumed or contractual liability under this Lease. The limit of any such insurance shall not, however, limit the liability of Tenant hereunder. Tenant may provide this insurance under a blanket policy, provided said insurance shall have a landlord's protective liability endorsement attached thereto. If Tenant shall fail to procure and maintain said insurance, Landlord may, but shall not be required to, procure and maintain the same, but at the expense of Tenant. Insurance required hereunder shall be in companies rated A-XI or better in "Best's Key Rating Guide" for insurance companies. Tenant shall deliver to Landlord, prior to right of entry, certificates evidencing the existence and amounts of such insurance with loss payable clauses satisfactory to Landlord. No policy shall be cancellable or subject to reduction of coverage without prior written consent of Landlord. All such policies shall be written as primary policies not contributing with and not only in excess of coverage which Landlord may carry.

14.3    Personal Property Insurance. Tenant shall, at Tenant's cost, maintain, as named insured, fire and extended coverage insurance on the Premises and any leasehold improvements, personal property, inventory, and contents of the Premises in an amount sufficient so that no co-insurance is required in the event of loss.

14.4    Workers' Compensation. To the extent required by law, Tenant shall maintain all workers' compensation or similar insurance in the form and amounts required by law.

14.5    Contractor's Insurance. Prior to engaging any contractor, Tenant shall require any contractor performing work on the Premises at Tenant's request or on Tenant's behalf to carry and maintain such insurance as Landlord may require from time to time, including contractor's liability coverage and workers' compensation insurance.

14.6    Tenant's Product Liability Insurance. Tenant shall, at Tenant's cost, maintain, as named insured, product liability insurance of not less than $1,000,000.

15.    Utilities. Tenant shall pay for all water, gas, heat, light, power, sewer charges, telephone service, and all other services and utilities supplied to the Premises together with any taxes thereon. If any such services are not separately metered to Tenant, Tenant shall pay a reasonable proportion to be determined by Landlord on all charges jointly metered with other users of such services located at the Premises. Tenant shall indemnify and save Landlord harmless against any liability or damages on such accounts. Should Tenant require installation of any specific utility metering for any utility, such cost of installation shall be borne by Tenant.

16.    Personal Property Taxes. Tenant shall pay or cause to be paid before delinquency any and all taxes levied or assessed and which become payable during the term hereof upon all of Tenant's leasehold improvements, equipment, furniture, fixtures, and any other personal property located in the Premises. In the event any or all of Tenant's leasehold improvements, equipment, furniture, fixtures, and any other personal property shall be assessed and taxed with the real property, Tenant shall pay to

Landlord Tenant's share of such taxes within ten days after delivery to Tenant by Landlord of a statement in writing setting forth the amount of such taxes applicable to Tenant's property.

17. _Entry by Landlord._ The Landlord, or its agents or representatives, may after a minimum of forty-eight (48) hours written notice to Tenant, enter into or upon the Premises or any part thereof during normal business hours for the purpose of examining the condition thereof, and for the purpose of making any repairs which Landlord is required to make. Provided, however, that Tenant shall provide, at Tenant's sole cost, an escort for Landlord or its agent. Any violation of this section shall constitute a material breach of this Agreement. Landlord shall have the right to use any and all means which Landlord may deem proper to open any doors or otherwise obtain access to the Premises in an emergency, without liability to Tenant except for any failure to exercise due care for Tenant's property, and any entry to the Premises obtained by Landlord by any of said means or otherwise shall not under any circumstances be construed or deemed to be a forcible or unlawful entry into or a detainer of the Premises or an eviction of Tenant from the Premises or any portion thereof.

18. _Assignment and Subletting._ Tenant shall not either voluntarily or by operation of law assign, transfer, mortgage, pledge, hypothecate, or encumber this Lease or any interest therein and shall not sublet the Premises or any part thereof or any right or privilege appurtenant thereto or allow any person (the employees, agents, servants, and invitees of Tenant excepted) to occupy or use the Premises or any portion thereof without the prior written consent of Landlord, which consent shall not be unreasonably withheld. If Tenant is a corporation, unincorporated association, or partnership, the transfer, assignment, or hypothecation of any stock or interest in such corporation, association, or partnership, whether voluntary or involuntary or by operation of law or otherwise in the aggregate in excess of fifty-one percent (51%) shall be deemed an assignment within the meaning and provisions of this Section 18. Any such assignment or subletting without such consent shall be voidable by Landlord and may constitute a default under the terms of this Lease. ~~In the event Tenant sublets or assigns this Lease for rent in excess of that paid by Tenant, or for a fee, Landlord shall receive one-half (1/2) of the excess rental or fee paid by such sublessee or assignee.~~ A consent to one assignment, subletting, occupation, or use by any other person shall not be deemed to be a consent to any subsequent assignment, subletting, occupation, or use by another person. Consent to any such assignment or subletting shall in no way relieve Tenant of any liability under this Lease. It is understood and agreed that Landlord may fully assign Landlord's interest in this Lease as Landlord. Landlord may assign the rental herein provided to any person, partnership, corporation, or bank, and Tenant agrees when notified in writing by the assignee of such assignment to make the rental payments to assignee under the terms of said assignment.

Not withstanding the foregoing, Landlord agrees to allow Tenant to assign Tenant's interest in this Lease to Stirling Hort. LLC. As a condition to Landlord's approval, any potential assignee or sublessee otherwise approved by Landlord shall assume all obligations of Tenant under this Lease and shall be jointly and severally liable with Tenant and any guarantor, if required, for the payment of Rent and performance of all terms of this Lease.

19. _Holding Over._ If Tenant remains in possession of the Premises or any part thereof after the expiration of the term hereof with the express written consent of Landlord, such occupancy shall be a tenancy from month to month at a rental in the amount of one hundred fifty percent of the last monthly minimum rent, plus all other charges payable hereunder, and upon all the terms hereof applicable to a month-to-month tenancy including the provisions for an award of reasonable attorney's fees in the event of default by tenant.

20. _Tenant's Default._ The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

20.1 _Abandonment_. Tenant vacates or abandons the Premises.

20.2 _Failure to Pay Rent_. Tenant fails to make any payment of rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of ten (10) days after written notice thereof by Landlord to Tenant.

20.3 _Failure to Observe Other Covenants_. Tenant fails to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than described in Section 20.2 herein, where such failure shall continue for a period of thirty (30) days after written notice thereof by Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for such cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said thirty (30) days and thereafter diligently prosecutes such cure to completion.

20.4 _Insolvency_. Tenant makes any general assignment or general arrangement for the benefit of creditors or the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or a petition of reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days) or the appointment of a trustee or a receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within sixty (60) days of the attachment, execution, or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interests in this Lease where such seizure is not discharged within sixty (60) days.

20.5 _Misrepresentation_. Tenant makes or has made or furnishes or has furnished any warranty, representation, or statement to Landlord in connection with this Lease, or any other agreement to which Tenant and Landlord are parties, which is or was false or misleading in any material respect when made or furnished.

20.6 _Failure to Take Possession_. Tenant fails to take possession of the Premises on the Commencement Date as the same may be extended hereunder.

21. _Remedies on Default_. In the event of any default or breach by Tenant, Landlord may, at any time thereafter with or without notice or demand and without limiting Landlord in the exercise of a right or remedy which Landlord may have by reason of such default or breach, exercise any of the following remedies:

21.1 _Termination of Possession_. Landlord may terminate Tenant's right to possession of the Premises by written notice to Tenant or any other lawful means, terminate this Lease by written notice to Tenant, revoke Tenant's right to any free rent or other lease concessions and recover the value of any such concessions made, re-enter and take possession of the Premises, and Tenant shall immediately surrender possession of the Premises to Landlord. In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default, including without limitation past-due rent, interest and late charges, the cost of recovering possession of the Premises, the expenses of reletting, and any other costs or damages arising out of Tenant's default, including without limitation the costs of removing persons and property from the Premises, the costs of repairing or altering the Premises for reletting, brokers' commissions, and legal expenses and fees. Notwithstanding any termination, re-entry, or reletting, the liability of Tenant for the Minimum Rent, Additional Rent, and other charges and adjustments for the balance of the Lease Term shall not be extinguished and Tenant shall pay and Landlord may recover from Tenant at the time of termination, re-entry, or reletting, the excess, if any, of

the amount of such rents reserved in this Lease for the balance of the term hereof over the then reasonable rental value of the Premises for the same period. Reasonable rental value shall mean the amount of rental which Landlord does or could reasonably be expected to obtain as rent for the remaining balance of the Lease Term. In the event that Landlord relets the Premises or any part thereof without first terminating Tenant's right to possession pursuant to this Lease, Landlord reserves the right, at any time thereafter, to elect to terminate Tenant's right to possession to that or other portions of the Premises for the default that originally resulted in the reletting.

      21.2    Enforcement of Lease. Landlord may maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises. In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover the Minimum Rent, Additional Rent, and any other charges and adjustments as may become due hereunder. Landlord's failure or inability to relet the Premises or any part thereof shall not reduce or restrict or in any way affect Landlord's right to recover from Tenant all such rent and other sums as the same become due, and, despite such failure or inability to so relet the Premises or any part thereof, Tenant shall pay to Landlord upon demand therefor any and all costs, including without limitation the cost of any alterations and repairs to the Premises, incurred by Landlord in connection with Landlord's effort to relet the Premises or any part thereof.

      21.3    Other Remedies. Landlord may pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state in which the Premises are located, in addition to the foregoing. It is understood and agreed that Landlord's remedies hereunder are cumulative, and the exercise of any right or remedy shall not constitute a waiver of any other right or remedy.

      21.4    Removal of Personal Property. In the event of a retaking of possession of the Premises by Landlord, Tenant shall remove all personal property located thereon and, upon failure to do so upon demand of Landlord, Landlord may remove and store the same in any place selected by Landlord, including without limitation a public warehouse, at the expense and risk of Tenant. If Tenant shall fail to pay the cost of storing any such property after it has been stored for a period of 30 days or more, Landlord may sell any or all of such property at a public or private sale and shall apply the proceeds of such sale first to the cost of such sale, secondly to the payment of the charges for storage, if any, and thirdly to the payment of any other sums of money which may be due from Tenant to Landlord under the terms of this Lease, and the balance, if any, to Tenant. Tenant hereby waives all claims for damages that may be caused by Landlord's lawfully re-entering and taking possession of the Premises or lawfully removing and storing the property of Tenant as herein provided and will hold Landlord harmless from loss or damages occasioned by Landlord thereby, and no such lawful re-entry shall be considered or construed to be a forcible entry.

      22.    Damage and Reconstruction. Should the Premises be damaged during the term of this Lease, Tenant shall immediately notify Landlord, and the rights and responsibilities of Landlord and Tenant shall then be as follows:

      22.1    Insured Damage. In the event the Premises or the Building are damaged by fire or other perils covered by Landlord's casualty insurance, Landlord agrees forthwith to commence repair of the same to the extent of insurance proceeds available and this Lease shall remain in full force and effect, except that Tenant shall be entitled to a proportionate reduction of the Minimum Rent from the date of damage and while such repairs are being made, such proportionate reduction to be based upon the extent to which the damage and making of such repairs shall cause undue interference with the business carried on by Tenant in the Premises. If the damage is due to the fault or neglect of Tenant or Tenant's employees, there shall be no abatement of rent.

22.2    Other Damage.  In the event the Premises or the Building are damaged as the result of any cause other than the perils covered by Landlord's casualty insurance or for which insurance proceeds are insufficient fully to cover, then Landlord shall forthwith commence repair of the same, provided the extent of the destruction is less than ten percent of the then full replacement cost of the Premises or the Building, respectively.  In the event the destruction of the Premises or the Building is to an extent of ten percent or more of the full replacement cost, then Landlord shall have the option (a) to repair or restore such damage, this Lease continuing in full force and effect, but the Minimum Rent to be proportionately reduced as provided above; or (b) to give notice to Tenant at any time within 60 days after such damage, terminating this Lease as of the date specified in the notice, which date shall be no more than 30 days after the giving of such notice.  In the event of giving such notice, this Lease shall expire and all interest of Tenant in the Premises shall terminate on the date so specified in such notice and the Minimum Rent, reduced by a proportionate reduction based upon the extent, if any, to which such damage unduly interferes with the business carried on by Tenant in the Premises, shall be paid up to the date of such termination.

22.3    Damage During Last 3 Months.  Notwithstanding anything to the contrary contained in this Section 22, Landlord shall not have any obligation whatsoever to repair, reconstruct, or restore the Premises or the Building when the damage resulting from any casualty covered under this Section 22 occurs during the last three (3) months of the term of this Lease or any extension thereof.  In such event, Landlord may, at Landlord's option:  (a) terminate this Lease in the manner provided in Section 22.2 herein; or (b) reduce the Minimum Rent by a proportion equal to the extent, if any, the damage unduly interferes with the business carried on by Tenant in the Premises.

22.4    Damage to Tenant's Property.  Landlord shall not be required to repair any injury or damage by fire or other cause or to make any repairs or replacements of any leasehold improvements, fixtures, or other personal property of Tenant.

23.    Eminent Domain

23.1    Taking.  If twenty-five percent or more of the Premises or the Building shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain, either party hereto shall have the right at its option within 60 days after said taking to terminate this Lease upon 30 days' written notice.

23.2    Partial Taking.  If less than twenty-five percent of the Premises are taken, or twenty-five percent or more of the Premises are taken and neither party elects to terminate as herein provided, the Minimum Rent thereafter to be paid shall be equitably reduced.  If any other part of the Building of which the Premises are a part may be so taken or appropriated, Landlord shall within 60 days of said taking have the right at Landlord's option to terminate this Lease upon written notice to Tenant.

23.3    Award.  In the event of any taking or appropriation whatsoever, Landlord shall be entitled to any and all awards or settlements which may be given and Tenant shall have no claim against the condemning authority or Landlord for the value of any unexpired term of this Lease, and Tenant hereby assigns to Landlord any and all claims to any award or settlement.  Nothing contained herein shall be deemed to give Landlord any interest in or to require Tenant to assign to Landlord any award made to Tenant for the taking of personal property or fixtures belonging to Tenant, for the interruption of or damage to Tenant's business, or for Tenant's moving expenses.

24.    Signs



24.1    Tenant Signs.  Tenant may, at Tenant's sole expense, place external signs on the Premises, provided such signs have been approved in advance by Landlord, and provided such signs do not violate any statute or regulation existing during the term of this Lease.  Landlord agrees to signage as required by the Washington State Liquor Control Board.  Tenant shall pay the costs of removal of such signs upon termination of the Lease, and such signs shall be the property of Tenant.

24.2    "For Lease" or "For Sale" Signs.  At any time within 180 days prior to the expiration of this Lease, Landlord may place upon the Premises "for lease" signs.  Landlord may place "for sale" signs on the Premises at any time during the Lease Term.

25.    Subordination and Modification by Lender.  Tenant agrees that this Lease shall be subordinate to any mortgage or deed of trust that may hereafter be placed upon the Premises or the Building and to any and all advances to be made thereunder, to the interest thereon, and all renewals, replacements, and extensions thereof; provided, the lender secured by and named in such mortgage or deed of trust shall agree in writing to recognize this Lease of Tenant in the event of foreclosure, if Tenant is not in default.  In the event any such lender elects to have this Lease a prior lien to lender's mortgage or deed of trust, then and in such event, upon such lender notifying Tenant to that effect, this Lease shall be deemed prior in lien to the said mortgage or deed of trust, whether or not this Lease is dated prior or subsequent to the date of said mortgage or trust deed.  Within 15 days of presentation, Tenant agrees to execute any documents which such lender may require to effectuate the provisions of this Section 25.  Tenant further agrees that if, in connection with obtaining financing for the Real Property, the Building, or the Premises, a lender shall request modification of this Lease as a condition to such financing, Tenant shall not withhold, delay, or defer Tenant's consent thereto, provided that such modifications do not increase the financial obligations of Tenant hereunder or materially adversely affect the leasehold interest hereby created.

26.    Tenant's Statement.  Tenant shall at any time and from time to time upon not less than three days' prior written notice from Landlord execute, acknowledge, and deliver to Landlord a statement in writing (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified is in full force and effect) and the date to which the rental and other charges are paid in advance, if any; (b) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed; and (c) setting forth the date of commencement of rents and expiration of the term hereof.  Any such statement may be relied upon by any prospective purchaser or encumbrancer of the Real Property, the Building, or the Premises.  Failure to provide such statement shall be deemed confirmation of the statement of Landlord regarding each of the foregoing items.

27.    Authority of Tenant.  If Tenant is a corporation or partnership, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of such entity, in accordance with the bylaws of such corporation or the partnership agreement of such partnership, and that this Lease is binding upon such entity in accordance with its terms.  Upon request, Tenant agrees to provide a Certificate of Officer verifying the authority and position of each signator.

28.    Extension of Lease Term.  Provided Tenant is not and has not been in default, as determined by Landlord, under any of the terms, conditions, or covenants of this Lease, Tenant shall have the right to extend the term of this Lease (the "Option") for two (2) additional three (3) year periods (the "Extension Periods").  To exercise this Option, Tenant must give Landlord notice in writing of Tenant's



exercise of the Option not less than 90 days prior to the end of the Lease Term as it may be extended hereunder. The Base Rent during the Extension Periods shall be as follows:

28.1    The Base Rent during the first year of the first Extension Period (year 4 overall) shall be Ten Thousand Three Hundred and NO/100 Dollars ($10,300.00) for the entire year, payable as approximately Eight Hundred and Thirty-Three and 33/100 Dollars ($833.33) per month.

28.2    The Base Rent during the second year of the first Extension Period (year 5 overall) shall be Ten Thousand Six Hundred Nine and NO/100 Dollars ($10,609.00) for the entire year, payable as approximately Eight Hundred and Eighty-Four and 08/100 Dollars ($884.08) per month.

28.3    The Base Rent during the third year of the first Extension Period (year 6 overall) shall be Ten Thousand Nine Hundred Twenty-Seven and NO/100 Dollars ($10,927.00) for the entire year, payable as approximately Nine Hundred and Ten and 58/100 Dollars ($910.58) per month.

28.4    The Base Rent during the first year of the second Extension Period (year 7 overall) shall be Eleven Thousand Two Hundred Fifty-Five and 08/100 Dollars ($11,255.08) for the entire year, payable as approximately Nine Hundred and Thirty-Seven and 92/100 Dollars ($937.92) per month.

28.5    The Base Rent during the second year of the second Extension Period (year 8 overall) shall be Eleven Thousand Five Hundred Eighty-Two and 73/100 Dollars ($11,582.73) for the entire year, payable as approximately Nine Hundred and Sixty-Five and 23/100 Dollars ($965.23) per month.

28.6    The Base Rent during the third year of the second Extension Period (year 9 overall) shall be Eleven Thousand Nine Hundred Forty and 51/100 Dollars ($11,940.51) for the entire year, payable as approximately Nine Hundred and Ninety-Five and 04/100 Dollars ($995.04) per month.

In no event, however, shall the Minimum Rent rate for any Extension Period so granted be less than the Minimum Rent rate charged during the year preceding such Extension Period. In the event Tenant exercises this Option, all terms and conditions of the Lease, other than the Minimum Rent rate, shall remain in full force and effect.

29.    <u>Hazardous Substances and Clean Up</u>. To Landlord's knowledge, the Property has never been used for the production, storage, deposit, or disposal of toxic, dangerous, or hazardous substances, pollutants, or contaminants, including without limitation nuclear fuel or waste, and no such substances, pollutants, or contaminants have ever been placed or located upon the Property, which substances, pollutants, or contaminants, if found upon the Property, would subject the owner of, or any person holding a mortgage of or other security interest in, the Property to any damage, penalties, or liabilities under any applicable Governmental Requirement.

During the term of this Lease, the Tenant will not use the property for the production, storage, deposit, or disposal of toxic, dangerous, or hazardous substances, pollutants, or contaminants, including without limitation nuclear fuel or waste, and no such substances, pollutants, or contaminants. Tenant shall promptly clean up and remove any such substances, pollutants, or contaminants promptly upon their deposit on the leased premises and shall remain liable, notwithstanding the termination of this lease for such clean up and removal.

30.    <u>General Provisions</u>. Landlord and Tenant agree to the following general provisions:

30.1 _Waiver_. The waiver by Landlord of any term, covenant, or condition herein contained shall not be deemed to be the waiver of such term, covenant, or condition or any subsequent breach of the same or any other term, covenant, or condition herein contained. The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any preceding default by Tenant of any term, covenant, or condition of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such preceding default at the time of the acceptance of such rent.

30.2 _Joint Obligation_. If there be more than one tenant, or assignment or subleasing, the obligations hereunder imposed shall be joint and several.

30.3 _Time_. Time is of the essence of this Lease and each and all of its provisions in which performance is a factor.

30.4 _Headings_. The headings and section titles of this Lease are not a part of this Lease and shall have no effect upon the construction or interpretation of any part hereof.

30.5 _Successors and Assigns_. The covenants and conditions herein contained, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators, and assigns of the parties hereto.

30.6 _Recordation_. Neither Landlord nor Tenant shall record this Lease, but a short form memorandum hereof may be recorded at the request of either Landlord or Tenant.

30.7 _Quiet Possession_. Upon Tenant paying the rent reserved hereunder and performing all of the covenants, conditions, and provisions on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Premises for the entire term hereof, subject to all the provisions of this Lease. The Premises are leased subject to any and all existing encumbrances, conditions, rights, covenants, easements, restrictions, rights-of-way, and any matters of record, applicable zoning and building laws, and such matters as may be disclosed by inspection or survey.

30.8 _Overdue Payments_. Unpaid installments of the Minimum Rent, Additional Rent, or other sums due hereunder shall bear interest from the date due at the maximum rate permitted by law. Tenant hereby further agrees to pay any attorneys' fees and expenses incurred by Landlord by reason of Tenant's failure to pay Minimum Rent, Additional Rent, or other sums when due hereunder.

30.9 _Prior Agreements_. This Lease contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreements or understandings pertaining to any such matters shall be effective for any purpose. No provisions of this Lease may be amended or added to except by agreement in writing signed by the parties hereto or their respective successors in interest. This Lease shall not be effective or binding upon any party until fully executed by both parties hereto.

30.10 _Inability to Perform_. Neither the Landlord nor the Tenant shall be liable in damages or have the right to terminate this Lease for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its control including, but not limited to Acts of God, Government restrictions (including the denial or cancellation of any permits or other necessary governmental requirements), wars, insurrections and/or any other cause beyond the reasonable control of the party whose performance is affected.

30.11  Partial Invalidity.  Any provisions of this Lease which shall prove to be invalid, void, or illegal shall in no way affect, impair, or invalidate any other provision hereof, and such other provision shall remain in full force and effect.

30.12  Cumulative Remedies.  No remedy or election hereunder shall be deemed exclusive but shall whenever possible be cumulative with all other remedies at law or in equity.

30.13  Governing Law and Venue.  This Agreement is to be governed by and construed in accordance with the laws of the State of Washington applicable to contracts and leases made and to be performed wholly within that State, and without regard to the conflict of laws principles thereof.  Any suit arising under this Agreement will be brought in the state or federal courts sitting in Mount Vernon, Skagit County, Washington, the parties hereby waiving any claim or defense that the forum is not convenient or proper.  Each party hereby agrees that any such court will have in personam jurisdiction over it and consents to service of process in any manner authorized for such actions by Washington law.

30.14  Attorneys' Fees.  In the event of any action or proceeding brought by either party against the other under this Lease, the prevailing party shall be entitled to recover attorneys' fees, expenses of litigation, and costs of appeal.  In addition, should it become necessary for Landlord to employ legal counsel to enforce any of the provisions herein contained, Tenant agrees to pay all attorneys' fees and court costs reasonably incurred.  For the purposes of this provision, the terms "action" or "proceeding" shall include arbitration, administrative, bankruptcy, and judicial proceedings, including appeals therefrom.

30.15  Real Estate Commission.  Tenant warrants that no real estate broker or agent has been employed by Tenant or is entitled to receive any commission or fee from Tenant with respect to this transaction other than the brokers or agents to whom Landlord has consented by written agreement.  Tenant shall indemnify and save Landlord harmless from the claims of any real estate brokers or agents with whom Tenant may have dealt with respect to this transaction, other than as consented to in writing by Landlord.

30.16  Execution.  This Lease has been executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

30.17  Notices.  All notices to be given hereunder shall be deemed to have been given when given in writing by depositing the same in the United States mail, postage prepaid, registered or certified mail, and addressed to the party at the respective mailing address as herein set forth, and shall be deemed effective 24 hours thereafter unless otherwise specified herein.

Landlord:

John and Toni Christianson
15806 Best Road
Mount Vernon, WA 98273

With a copy to:

Mr. John T. Burke, Esq.
Skagit Law Group, PLLC
P.O. Box 336
Mount Vernon, WA 98273

Tenant:

Stirling Horticulture
c/o James Easterlin
19331 Wayne Ave.

With a copy to:

*Mount Vernon, WA 5/4/2016*

Initials

Stanwood, WA 98292

It is understood that each party may change the address to which notices may be sent by giving a written notice of such change to the other party hereto in the manner herein provided.

30.18 _Trade Names_. Neither party to this Lease shall use or permit to be used any of the trade or service marks or trade or service names of the other without such party's prior written consent, except that Landlord may identify Tenant as a tenant in advertising, leasing materials, and brochures relating to the Building.

EXECUTED as of the day and year first above written.

LANDLORD:

_____          _____
JOHN CHRISTIANSON                  TONI CHRISTIANSON

LESSEE:

STIRLING HORTICULTURE/ JAMES EASTERLIN

_____
JAMES EASTERLIN, Individually and as proprietor of Stirling Horticulture

_Please see attached_
_Notary Statement_
_Suzy a Kelly_
_5-9-16_

_Mount Vernon, WA 5/4/2016_

Initials

Page 17 of 18

State of Washington )
                     ) ss

County of Skagit )

      I certify that I know or have satisfactory evidence that John and Toni Christianson is/are the person(s) who appeared before me and said person acknowledged that he/she signed this instrument and acknowledged it to be his/her free and voluntary act for the uses and purposes mentioned in the instrument.

      Dated: May 9th, 2016.

```
┌─────────────────────────────────┐
│                                 │
│         Notary Public           │
│       State of Washington       │
│          LUCY A KELLY           │
│ My Appointment Expires Jan 30, 2017 │
│                                 │
└─────────────────────────────────┘
```

(Signature)

NOTARY PUBLIC

*Lucy A. Kelly*

Print Name of Notary

My appointment expires: *1-30-2017*


State of Washington )
                     ) ss

County of Skagit )

      I certify that I know or have satisfactory evidence that James Easterlin is the person who appeared before me and said person acknowledged that he/she signed this instrument and acknowledged it to be his/her free and voluntary act for the uses and purposes mentioned in the instrument.

      Dated: May 9th, 2016.

```
┌─────────────────────────────────┐
│                                 │
│         Notary Public           │
│       State of Washington       │
│          LUCY A KELLY           │
│ My Appointment Expires Jan 30, 2017 │
│                                 │
└─────────────────────────────────┘
```

(Signature)

NOTARY PUBLIC

*Lucy A. Kelly*

Print Name of Notary

My appointment expires: *1-30-2017*

Initials

John Christianson                                             May 30, 2016
15806 Best Road
Mt. Vernon, WA.
98273

StirlinghortLLC
 James Easterlin
15612 Best Road
Mt. Vernon, WA
98273

Reference:  In accordance with Lease dated June 8th 2016. Section 4.4.2 "Calculation and Payment of
Additional Rent" Bld A Suite 2. From June 8th to January 2017.

1. Maintenance costs for  property at 15612 Best Rd.
   A) 3000.00
   B) percent of rental space 18%
   C) Total per year Maintenance costs 540.00
2. Land and building taxes
   A) 3000.00
   B) percent of rental space 2%
   C) Total per year taxes cost 540.00

Monthly amount Additional Rent Suite 2 Bld A is 90.00


John Christianson  _____

Toni Christianson  _____

James Easterlin    _____  7-14-2016

# EXHIBIT A





BLD "A"

N

10'

30 ft

FENCED LAND AREA

SUITE 1
12' X 65'
780 SQ FT

SUITE 2
108 X 65'
7440 sq.ft.

60' + 40'

120'

PARKING

65'

PARKING

# EXHIBIT B



Lot 1, Short Plat No. 23-83, approved April 23, 1983 and recorded May 24, 1983, under Auditor's File No. 8305240081 in Volume 6 of Short Plats, page 63, records of Skagit County, Washington; being a portion of the North ½ of the Southeast ¼ of Section 20, Township 34 North, Range 3 East, W.M. Situate in the County of Skagit, State of Washington.

# ADDINDUM TO LEASE

For Building Lease building A suite 1 at 51612 Best Road Mt Vernon WA. between Stirling Horticulture and James Easterlin (collectively the Tenant) and John and Toni Christianson the (landlord) dated 5-9-2016


Additional language for 21.4

The landlord must contact the Washington State Liquor Control Board (WSLCB) Prior to entering premise to take possession of personal property. The WSLCB must ensure no marijuana or marijuana products are left onsite. If marijuana or marijuana products are left onsite then WSLCB is authorized to take possession and destroy them.

Signed this 8th day of June 2016

John Christianson _____

James Easterlin _____

Exhibit D

**<u>Stirling Hort v. Industrial Ventilation, Inc.</u>**
**Skagit County Superior Court Case No: 21-2-00587-29**

Frey Buck Staff Assigned: TB/NG/RZ/SJ                    File No: 12673.034952

| EMAIL SERVICE LIST: | JUDGE<br>NONE ASSIGNED |
|---|---|
| **Plaintiff: Stirling Hort, LLC**<br>Mark Lee, WSBA #19339<br>Haylee J. Hurst, WSBA #51406<br>Wolf & Lee, LLP<br>230 E. Champion Street<br>Bellingham, WA 98225<br>mark@bellinghamlegal.com<br>haylee@bellinghamlegal.com<br>suzanne@bellinghamlegal.com<br><br>Assistant: Suzanne<br>Tel: (360) 676-0306 | **Associated Counsel: IVI**<br>Claude Bosworth, WSBA #42568<br>Rizzo Mattingly Bosworth, P.C.<br>900 Washington Street, Suite 1020<br>Vancouver, WA 98660<br>cbosworth@rizzopc.com<br>bsocha@rizzopc.com<br><br>Assistant:<br>Tel: (360) 448-4284 |
| **Counsel for Defendant Knutzen Farm, L.P.**<br>Mark Augustus Thompson<br>Mix Sanders Thompson, PLLC.<br>1420 5th Avenue, Suite #2200<br>Seattle, WA 98101<br>E-mail: mark@mixsanders.com | **Counsel for Defendant Industrial Ventilation, Inc.**<br>Ted Buck, WSBA #22029<br>Nick Gross, WSBA #48236<br>Frey Buck P.S.<br>1200 Fifth Avenue, Ste. 1900<br>Seattle, WA 98101<br>tbuck@freybuck.com<br>ngross@freybuck.com |

# Civil Coversheet

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

STIRLING HORT, LLC, a Washington limited liability company

**DEFENDANTS**

INDUSTRIAL VENTILATION, Inc., an Idaho corporation

**(b)** County of Residence of First Listed Plaintiff   Skagit
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Canyon
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

Attorneys *(If Known)*

See attachment

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 840 Trademark | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [x] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [x] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1441 et seq

Brief description of cause:
diversity jurisdiction

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
approx. $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
8/15/2022

SIGNATURE OF ATTORNEY OF RECORD
s/Ted Buck

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**I(c). Attorney Contact Information:**

**Plaintiff's Counsel:**
Mark J. Lee
Haylee J. Hurst
Elizabeth Slattery
Wolf & Lee, LLP
230 E. Champion Street
Bellingham, WA 98225
(360) 676-0306

**Defendant's Counsel:**
Ted Buck
Nick Gross
Frey Buck P.S.
1200 Fifth Ave., Ste. 1900
Seattle, WA 98101
(206) 486-8000